UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT DASCOLA,

    Plaintiff,

    vs.

CITY OF ANN ARBOR and
JACQUELINE BEAUDRY,
ANN ARBOR CITY CLERK,

    Defendants,

and

SECRETARY OF STATE RUTH
JOHNSON,

    Intervenor-Defendant
_____/

Case No. 2:14-cv-11296-LPZ
Hon. Lawrence P. Zatkoff

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on July 22, 2014

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

Currently before the Court is Plaintiff Robert Dascola's post-judgment motion for additional injunctive relief [dkt. 29]. The motion is fully briefed. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted without oral argument. For the following reasons, Plaintiff's motion is GRANTED.

## II. BACKGROUND

The facts of this case have been outlined in great detail, both by this Court and other information outlets. As previously established, on May 8, 2014, Plaintiff Robert Dascola ("Plaintiff") filed an Amended Complaint in this Court, alleging the City of Ann Arbor and Ann Arbor City Clerk Jacqueline Beaudry (the "Ann Arbor Defendants") were violating his rights under the Equal Protection Clause of the Fourteenth Amendment and his rights under 42 U.S.C. § 1983. Plaintiff argued that, by attempting to enforce provisions of the Ann Arbor City Charter that federal courts previously found unconstitutional and void, the Ann Arbor Defendants were impermissibly prohibiting Plaintiff from running for Councilmember in the Third Ward of the City of Ann Arbor. On May 20, 2014, this Court entered an opinion and order in favor of Plaintiff. The Court entered its judgment ("Original Judgment") the same day. Specifically, the Court's Original Judgment stated:

> IT IS HEREBY ORDERED that Defendants are permanently enjoined from taking any action to enforce the provisions of Section 12.2 of the Charter of the City of Ann Arbor which were declared unconstitutional and void in *Daniel J. Feld, et al v. City of Ann Arbor and Harold Summers*, File No. 37342 (E.D. Mich. 1972) and *Human Rights Party, et al v. City of Ann Arbor, et al,* File No. 37852 (E.D. Mich. 1972) prior to re-enactment.
> IT IS FURTHER ORDERED that Plaintiff's request for Writ of Mandamus is GRANTED.
> IT IS FURTHER ORDERED that Defendants must accept and process any nominating petitions submitted by Plaintiff and determine his eligibility without regard to the voided provisions of Section 12.2 of the Charter of the City of Ann Arbor.

Pursuant to the Original Judgment, the Ann Arbor Defendants allege they accepted and processed Plaintiff's nominating petition so that his name would appear on the primary ballot for the Councilmember election in the Third Ward. On June 25, 2014, however, the Ann Arbor Defendants mailed absentee ballots without Plaintiff's name (the "inaccurate ballots") to 392

residents of the Third Ward. The events leading up to this error are covered extensively in the Ann Arbor Defendants' response to Plaintiff's post-judgment motion. The Ann Arbor Defendants state the following occurred:

> The candidates for Ann Arbor elections were placed on a ballot being prepared by the Washtenaw County Clerk's office because the ballot contained city, county, and state races.
>
> Pursuant to established process, the County Clerk's Office advised the City Clerk to review the proof ballots and sign off on the ballots . . . Pursuant to established process, the City Clerk timely reviewed the "proof" ballots for all City wards. Plaintiff was correctly on the proof ballots.[1] Pursuant to established process, the City Clerk filled out a form and checked that "All races are listed and candidates' names are properly rotated." This form was sent by the City Clerk to the County Clerk.
>
> After the proof ballots were approved by the City Clerk, the preparation of the ballot was done by the Washtenaw County Clerk's office, but for some unexplained reason the computer programmer or other vendor employed by the County Clerk's office deleted all of the City of Ann Arbor races on the ballot. New proof ballots were produced with this error. This error evidently was caught by the County Clerk's office. However, the County Clerk's office never informed the City Clerk of this error.
>
> The County Clerk's office then added the Ann Arbor City races back on the ballot, but now without the Plaintiff's name on the ballot for the 3rd Ward race. This error was not caught by the Washtenaw County Clerk's Office. Evidently this new ballot was never checked against the initial proof ballots that had been approved. When the ballot was "corrected" a second time new proof ballots were never sent to the City Clerk to review.
>
> The final proof ballots without the Plaintiff's name on them were then sent to the Washtenaw County Election Commission for final approval. The Election Commission consists of the Washtenaw County Clerk, a Washtenaw County Probate Judge, and the Washtenaw County Treasurer. After discussing and reviewing the ballots, the Commission voted to approve the ballots on June 9, 2014.
>
> The County Clerk's Office evidently did not inform the Washtenaw County Election Commission of the changes that had occurred on the ballot after the initial ballots were proofed and the Washtenaw County Election Commission did not catch the omission of Plaintiff's name.

---

[1] Plaintiff admits that he also reviewed the proof ballots and that his name did appear on them.

> After the Washtenaw County Election Commission approved the ballots, they were sent to the printer; once the ballots were printed they were delivered to the City Clerk's office and stuffed into envelopes to be sent to residents who had requested absentee ballots. On June 25, 2014, [the] Ann Arbor City Clerk mailed over 1,800 absentee ballots, including 392 absentee ballots to residents in the 3rd Ward. Upon receipt of an absentee ballot on Friday, June 27, 2014, a 3rd Ward resident called the City Clerk's office to inform the City Clerk of the omission on the ballot. The City Clerk's office immediately ceased sending the 3rd Ward absentee ballots.
> New ballots were requested by the City Clerk and immediately ordered by the Washtenaw County Clerk's office. The second ballots were delivered to the Ann Arbor City Clerk's office on Monday, June 30, 2014. On that day, second ballots were sent to the 392 residents who had been mailed the first ballot along with a letter explaining the error and requesting that the second ballots be returned. (internal citations omitted).

This letter (the "instruction letter") contained instructions for absentee voters in the Third Ward to destroy the inaccurate ballots they received and to return only these new ballots (the "accurate ballots"). The instruction letter also advised absentee voters to use the accurate ballots and return them even if they had already returned an inaccurate ballot. The instruction letter contained no information regarding whether the Ann Arbor Defendants planned on counting any votes in the Third Ward race cast on the inaccurate ballots if an accurate ballot was not received. The instruction letter did state, however, that the Ann Arbor Defendants were working "in accordance with direction provided by the Michigan Department of State, Bureau of Elections."

On the same day the accurate ballots and the instruction letter were sent to absentee voters in the Third Ward, Director of Elections for the Michigan Bureau of Elections Christopher Thomas sent Defendant Clerk Beaudry a letter containing directions on "the tabulation of absent voter ballots for Ann Arbor's Ward 3 City Council candidates in the August 5, 2014, primary" (the "Directive"). The Directive states:

> Regarding the impact of votes for Ward 3 City Council candidates when an absent voter returns only the original (incorrect) ballot and does not return the replacement ballot – those votes are valid and shall be counted.

On July 7, 2014, Plaintiff filed the instant motion, challenging the stance taken by the Michigan Bureau of Elections and Christopher Thomas in the Directive. Plaintiff requests this Court enjoin the Ann Arbor Defendants from counting any votes cast for Third Ward Councilmembers on the inaccurate ballots. Plaintiff asserts that counting any of the votes in the Third Ward Councilmember election contest cast on the inaccurate ballots would be in violation of this Court's Original Judgment and constitutes a further denial of Plaintiff's right to equal protection under the Due Process clause of the Fourteenth Amendment.

On July 9, 2014, the Ann Arbor Defendants responded to Plaintiff's post-judgment motion, contending that they would take no position on whether the Court should grant Plaintiff's request. Instead, the Ann Arbor Defendants allege the dispute is primarily between the State of Michigan and Plaintiff, as "the Director of Elections has issued a directive to the [Defendant] City Clerk on this issue and the Secretary of State maintains statutory supervisory control over local election officials . . . ."

On July 11, 2014, Intervenor-Defendant Secretary of State Ruth Johnson ("the Secretary of State") filed a motion to intervene, seeking permission from the Court to intervene in this matter as a party defendant. The Court granted the Secretary of State's motion, finding that the Ann Arbor Defendants had raised a claim or defense predicated on the Directive sent by Christopher Thomas in his official capacity as an officer of the Secretary of State.

Subsequently, the Secretary of State filed a response to Plaintiff's post-judgment motion. The Secretary of State argues that votes in the Third Ward Councilmember primary election cast on inaccurate ballots where no other ballot is received should be counted. The Secretary of State

5

contends that "each absent voter that received the [inaccurate] ballot will also receive [an accurate] ballot, every voter will have the opportunity to review the [accurate] ballot and determine whether they wish to revise their vote in light of [Plaintiff's] name appearing there." The Secretary of State contends that to treat the accurate and inaccurate ballots otherwise would disenfranchise Third Ward absentee voters. The Secretary of State further argues that it has the authority under Michigan law to issue instructions and to advise and direct local election officials without promulgating rules. Finally, the Secretary of State contends this Court should abstain from determining a "difficult question of state law" and that Plaintiff's claim is not yet ripe and thus should not be entertained at this time.

### III. ANALYSIS

Prior to analyzing the issue at hand, the Court must address the failure precipitating the need for such analysis. The Court recognizes Plaintiff's current motion would not be before the Court but for the Ann Arbor Defendants' inability to place Plaintiff on the Third Ward primary election ballot. After the Ann Arbor Defendants and Plaintiff presented a myriad of arguments in the underlying matter, the Court held that the Ann Arbor Defendants' attempts to enforce sections of the Ann Arbor City Charter previously found unconstitutional and void were inapposite to the basic foundation of the United States legal system. In finding in favor of Plaintiff, the Court found that Plaintiff's right to the issuance of a writ of mandamus was clear and indisputable, stating:

> taking into consideration the [Ann Arbor] Defendants' demonstrated inability (or unwillingness) to follow the explicit orders issued by federal courts with regards to the constitutionality of the provisions at issue, the Court finds that issuing a writ of mandamus is necessary to guarantee Plaintiff receives the relief to which he is entitled.

Whether intentional or otherwise, the Ann Arbor Defendants have once again failed to follow the explicit orders issued by a federal court. It is with this history in mind that this Court now turns to the instant motion.

Plaintiff argues that he has the legal right to have his name appear on all ballots used in the primary election for Third Ward Councilmember for the City of Ann Arbor. Counting any votes in this election contest cast on inaccurate ballots, Plaintiff asserts, would be in violation of this Court's Original Judgment and constitutes a further denial of Plaintiff's right to equal protection under the Due Process clause of the Fourteenth Amendment. The Court agrees.

Although the Secretary of State raises four arguments in the alternative,[2] the Court finds none of them convincing. Plaintiff's argument is the only position consistent with this Court's Original Judgment, the United States Constitution and federal legal precedent. The Secretary of State presents two procedural arguments and two substantive arguments as to why this Court cannot grant the relief sought by Plaintiff. The Court will address the Secretary of State's substantive arguments first, as only these arguments address the merit of Plaintiff's claims.

A. PLAINTIFF'S REQUESTED RELIEF DOES NOT DISENFRANCHISE ABSENTEE VOTERS

The Secretary of State argues all votes cast on inaccurate ballots in the Third Ward primary election must be counted. Director of Elections for the Michigan Bureau of Elections Christopher Thomas stated in the Directive that:

> Voters who cast votes in Ward 3 and only return the [inaccurate] ballot cannot have their votes voided due to the ballot printing error . . . there may be voters who would not change their vote in Ward 3 or will be out of town and unable to return the replacement ballot by Election Day. Neither situation can result in the disenfranchisement of these voters.

---

[2] The Court notes that the Ann Arbor Defendants did not officially take a position in this matter.

7

The Secretary of State attempts to support this stance by asserting "courts" have long held errors in ballot printing do not disenfranchise voters so long as election workers act in good faith.

Having considered all arguments presented by the parties, the Court finds the disenfranchisement arguments contained in the Directive and in the Secretary of State's brief: a) untenable, supported at best by inapplicable, unpersuasive and non-binding authority, and b) completely at odds with federal legal precedent.

First, the Court notes that the Secretary of State's argument inherently seeks to limit this Court's authority to enforce its own judgments. "The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987) (citing U.S. CONST. art. III, § 2). In the instant matter, this Court decided the Ann Arbor Defendants' attempts to enforce provisions found unconstitutional and void impermissibly violated Plaintiff's constitutional rights. In doing so, this Court ordered the Ann Arbor Defendants to accept and process Plaintiff's nominating petitions without using these void provisions. The Secretary of State's position – counting votes cast on ballots that do not contain Plaintiff's name – undermines the orders contained in the Court's Original Judgment. The Secretary of State provides absolutely no authority indicating the Court should act in such a way as to render its Original Judgment powerless, and the Court will not do so at this time.

More fundamental to the Court's decision, however, is the disenfranchisement of voters that would occur should the Court adopt the Secretary of State's argument. The United States Supreme Court established half a century ago that "the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). The Supreme Court later expanded on this statement, finding that, "[i]n decision after decision, this Court has made clear that a citizen has a constitutionally

protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Simply put, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 555.

With this precedent in mind, it is clear to the Court that Third Ward absentee voters will not be disenfranchised by enjoining the Ann Arbor Defendants from counting any "votes" cast on the inaccurate ballots in the Third Ward primary election. Rather, the Court finds that such an order would rectify the true act of disenfranchisement that has occurred: the disenfranchisement caused by the Ann Arbor Defendants when they delivered 392 inaccurate ballots that restricted Third Ward citizen's "right to vote freely for" all the candidates in the Third Ward primary election. Allowing any other result would amount to an act empowering the Ann Arbor Defendants and the Secretary of State to violate the Third Ward absentee voters' right to "participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336; *see also Bush v. Gore,* 531 U.S. 98, 104–105 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476–77 (6th Cir. 2008) ("a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.") (internal citations omitted).

While all parties ostensibly agree that Third Ward residents have the right to vote for Plaintiff, the Secretary of State nevertheless seeks to count votes cast on ballots where this right was denied. The Court finds this position embraces the very sort of denial referred to by the Supreme Court in *Reynolds* that "strike[s] at the heart of representative government" and would disparage the "essence of a democratic society." The Secretary of State's speculation that

9

absentee voters "may be disenfranchised" should these "votes" not count ignores the simple truth that the Ann Arbor Defendants' failure to provide 392 qualified voters with an accurate ballot has already resulted in disenfranchisement. As Plaintiff correctly articulates, "[n]o voter has the right to vote in the Julie Grand v. Samuel McMullen Council race shown on the [inaccurate ballot] because it doesn't exist. Third Ward voters have the right to vote in the Robert Dascola v. Julie Grand v. Samuel McMullen Council race."

Additionally, the Secretary of State provides little support to bolster its argument. First, the Secretary of State cites only to authority – three Michigan court cases and an Indiana state appellate decision – that provides no binding precedent to this Court. Further, the insight and arguments contained in these cases prove inapposite to the case at hand, as all four deal solely with issues arising from actions that occurred the same day as the election. The instant scenario, however, presents issues of disenfranchisement starting six weeks prior to election day.[3] Applying arguments and rationale – as the Secretary of State asks this Court to do – from cases where the parties seek to invalidate an election would be inappropriate.

The Court finds that enjoining the Ann Arbor Defendants from counting any votes cast in the Third Ward primary on inaccurate ballots is necessary to enforce its Original Judgment and to protect Plaintiff's rights under the Fourteenth Amendment. Additionally, such action is required to guarantee the voters disenfranchised by the Ann Arbor Defendants' mistakes are given the right to vote freely for any of the three candidates running in the Third Ward primary election, a right established by the United States Constitution and consistently protected by the federal judiciary.

---

[3] In distinguishing these two scenarios, the Court recognizes the significant amount of time between the August 5, 2014, primary election and the date the inaccurate ballots were delivered. The Court trusts the Ann Arbor Defendants and Intervenor-Defendant will use this time to take every action necessary to ensure the inaccurate ballots do not adversely affect the result of the Third Ward primary election.

B. THE SCOPE OF THE SECRETARY OF STATE'S AUTHORITY IS NOT RELEVANT

Plaintiff argues that the Secretary of State has no authority to bind – through the directives of Michigan Bureau of Elections Director Christopher Thomas – the Ann Arbor Defendants in this matter unless such action is taken pursuant to the Michigan Administrative Procedures Act ("MAPA"). The Secretary of State argues that it does have the authority to issue instructions and to advise and direct local election officials, and that this authority is not provided by MAPA.

The Court finds this argument has no bearing on the issue at hand: whether enjoining the Ann Arbor Defendants from counting votes cast in the Third Ward primary election on inaccurate ballots is proper. As established above, the scope of the Secretary of State's authority in issuing the Directive does not impact this Court's ability to protect Plaintiff's Fourteenth Amendment rights, to guarantee that absentee voters in the Third Ward primary election remain enfranchised, or to ensure that the relief granted in its Original Judgment is actually achieved.

As such, the Court finds this argument irrelevant to the present matter.

C. ABSTENTION IS NOT PROPER IN THIS INSTANCE

In addition to the substantive arguments it presents, the Secretary of State also argues there are procedural grounds barring this Court from granting Plaintiff's requested relief. The Secretary of State asserts that this Court should abstain from exercising its jurisdiction in this case because the "requirements of the *Burford* abstention doctrine" apply.  As the Secretary of State contends, the *Burford*[4] abstention doctrine establishes that:

> [w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state

---

[4] *See Burford v. Sun Oil Co*, 319 U.S. 315 (1943).

>administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (citing *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814 (1976)). As Plaintiff correctly contends, however, the Supreme Court also recognized "that *Burford* permits 'a federal court sitting in equity' . . . to dismiss a case only in extraordinary circumstances." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726 (1996) (internal citations omitted).

The Secretary of State contends that any action taken by this Court would constitute federal interference, disrupting "coordinated administration by the election authorities in Michigan." The Secretary of State argues that the question of whether an inaccurate ballot should be counted where a voter has failed to return an accurate ballot is a unique question of state law. Additionally, the Secretary of State asserts that whether it has the authority to issue direction and guidance to local clerks on election administration matters without promulgating formal rules is an issue of state law that should not be addressed by this Court.[5]

While the Secretary of State has accurately described the *Burford* abstention doctrine, the Court finds that the Secretary of State has failed to demonstrate the instant matter warrants such abstention. First, the Court notes that the Secretary of State completely ignored the *Burford* requirement that federal abstention is appropriate only where "timely and adequate state-court review" is available. The Secretary of State has provided no information as to whether such review is indeed available. Further, all the parties in this matter have consistently stressed the

---

[5] As Section B of this Opinion considers and dismisses this state authority argument, the Court will not address it again here.

necessity for expedient judicial action from this Court; to now suggest that the "unique state election matters" presented in this case could be "timely and adequately" reviewed by an uninitiated state forum prior to the August 5 primary election strikes the Court as disingenuous.

Further, the nexus of the Secretary of State's argument is that the issue presented – whether an inaccurate ballot should be counted where a voter has failed to return an accurate ballot – is a "unique state election issue." As established above, however, the issue involves matters of due process rights and the right to vote, both of which are fundamental and protected rights under the United States Constitution. This case also involves this Court's inherent ability to enforce the judgments it renders. As these issues are outcome determinative in this matter, the Court finds unconvincing the Secretary of State's blanket statement that this case hinges on a "unique state election issue."

Finally, the Secretary of State's argument that federal review would be "disruptive of state efforts to establish a coherent policy" is equally unpersuasive. The Secretary of State once again relies on precedent with no binding authority on this Court. Further, this precedent – one case from another federal circuit – concerns election law issues that arose after an election occurred, in stark contrast to the situation presented by the instant motion. The Secretary of State's assertions that "federal court intervention"[6] would be "disruptive" to any "coordinated administration"[7] by the election authorities in Michigan are supported by no authority or facts; moreover, the Secretary of State offers no evidence that it is attempting to establish coherent policy to deal with this issue.[8]

---

[6] The Court is struck by the fact that the Secretary of State is accusing this Court of "intervening" in state matters after filing a motion to intervene in this matter.
[7] The Court must also recognize that the Secretary of State's office issued opposing viewpoints regarding the central matter in this case within the same week. This type of inconsistency does not strike the Court as "coordinated."
[8] The Court encourages the Secretary of State and the Michigan legislature to create such a policy, so that federal court action may not be required in the future.

As such, the Court finds abstention inappropriate in this matter.

D. PLAINTIFF'S CLAIMS ARE RIPE

Finally, the Secretary of State argues that, as efforts are underway to rectify the Ann Arbor Defendants' error and the inaccurate ballots may not determine the outcome of the Third Ward primary election, Plaintiff cannot show that his claim is ripe. This argument is also unconvincing.

As established recently by the Sixth Circuit in another election law case, federal district courts have "jurisdiction to hear claims 'arising under the Constitution' and alleging unconstitutional practices taken under color of state law." *Hunter v. Hamilton Cnty. Bd. of Elections,* 635 F.3d 219, 232 (6th Cir. 2011). Further, "[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Id.*, at 234 (citing *Bush*, at 104).

The Secretary of State's argument is based solely on the premise that there will "likely be fewer than 10 ballots in question" by the time of the election. The Court finds this figure – provided by the Ann Arbor Defendants – to be completely speculative. Indeed, this number represents the number of absentee voters that have to this point "voted" with an inaccurate ballot and have yet to actually vote with an accurate ballot. This figure does not account for the hundreds of absentee voters that have yet to vote. As such, these voters have access to both the inaccurate and accurate ballots delivered by the Ann Arbor Defendants. The number of inaccurate ballots still outstanding that could be cast most certainly could be outcome determinative[9] in this election and cannot be ignored by this Court.

More fundamentally, however, the logic behind the Secretary of State's argument is unsound. As established above, 392 Third Ward absentee voters have already been

---

[9] As of the writing of this opinion, the Court believes this number to be in excess of 200 votes.

14

disenfranchised by the Ann Arbor Defendants' delivery of inaccurate ballots; to suggest no "injury" has occurred is simply incorrect. Further, the Secretary of State provides no authority supporting its argument that Plaintiff must wait until after the results of the Third Ward primary election are received to determine whether the Ann Arbor Defendants' violated his Fourteenth Amendment rights – and this Court's Original Judgment – by failing to place him on all Third Ward primary election ballots.

---

As is established above, the Court finds that counting any of the votes in the Third Ward Councilmember primary election cast on the inaccurate ballots would be in violation of this Court's Original Judgment, an act of disenfranchisement, and would constitute a further denial of Plaintiff's right to equal protection under the Due Process clause of the Fourteenth Amendment.

Finally, the Ann Arbor Defendants' failure to place Plaintiff on all Third Ward absentee ballots – and the Secretary of State's insistence to nevertheless count "votes" cast on inaccurate ballots – gives this Court grave concerns over the correct tabulation of all ballots in the Third Ward primary election for Councilmember in the City of Ann Arbor. As such, the Court finds it imperative to do everything within its powers to ensure that all votes are accurately counted and that no more "mistakes" occur with respect to the vote collecting and tallying process.

## IV. CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that Plaintiff's post-judgment motion for additional injunctive relief [dkt. 29] is GRANTED.

IT IS FURTHER ORDERED that Defendants and Intervenor-Defendant are enjoined from counting any votes cast on inaccurate ballots in the Third Ward Councilmember primary

election. This does not impact the ability of Defendants or Intervenor-Defendant to count votes cast on inaccurate ballots in other primary races.

IT IS FURTHER ORDERED that Plaintiff is awarded all reasonable costs and attorney's fees.

IT IS FURTHER ORDERED that Plaintiff, the Ann Arbor Defendants and the Secretary of State each have until 12 p.m. Friday, July 25, 2014, to file with the Court the following information:

a) What is the basic procedure for counting votes in the Third Ward primary election (i.e. Where will these votes be counted? Who will count the votes? If the votes will be certified, who will do so and what is the process for doing so? What process will the Ann Arbor Defendants and the Secretary of State use to guarantee only those absentee votes cast for Third Ward Councilmember on accurate ballots are counted?);

b) What are the safeguards currently in place to guarantee that all votes are counted accurately;

c) Do the parties' believe these are adequate safeguards in this situation to guarantee that all votes are counted accurately? If not, what other safeguards should be in place; and

d) Other information the parties' believe the Court should have to ascertain the probability that all votes cast in the Third Ward primary election will be counted correctly.

Such a filing shall contain specific and accurate support, including pinpoint citations to authority relied upon, and shall be limited to ten pages.

IT IS SO ORDERED.

                                                                    S/Lawrence P. Zatkoff  
                                                                    HON. LAWRENCE P. ZATKOFF  
Date: July 22, 2014                     U.S. DISTRICT COURT